UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RALPH EDWARD BALDENEGRO, | |
| Petitioner, | No. C 12-3072 PJH (PR) |
| vs. | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |
| LAURIE SMITH, Sheriff, Santa Clara County, Main Jail, | |
| Respondent. | |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set forth below, the petition is denied.

## BACKGROUND

A jury convicted petitioner "of 13 counts, including residential burglary, sexually assaulting his ex-girlfriend's 14-year-old daughter, inflicting corporal injury on his ex-girlfriend, who was also the mother of his six-year-old son, and kidnapping the boy. [Petitioner] was sentenced to 94 years to life in prison." *People v. Baldenegro*, 2011 WL 826179 at *1 (Cal. Ct. App. March 10, 2011). The California Court of Appeal affirmed his conviction and the Supreme Court of California denied his petition for review.

///
///
///

The following facts are excerpted from the opinion of the California Court of Appeal:

*Prosecution case*

[Petitioner] and Jane Doe One lived together from October 1996 through May 23, 2006, in Jane Doe One's house in Fremont. Jane Doe One and [petitioner] had a son together, John Doe, and Jane Doe One had a daughter, Jane Doe Two, from a prior relationship. John Doe was six years-old at the time of the events in question and Jane Doe Two was 14.

During Jane Doe One's relationship with [petitioner], he was very controlling and constantly checked on her. He would not allow her to reprimand John Doe when he misbehaved. There were also incidents of domestic violence in which [petitioner] had pushed Jane Doe One and forced her to the ground. On one occasion, he had grabbed her by the neck. She did not report these incidents because [petitioner] would block her from using the phone, had threatened to burn the house down, and had told her that it would "all be over" before the police could arrive.

In 2002, the physical intimacy between Jane Doe One and [petitioner] ended, and [petitioner] moved into John Doe's bedroom. In October 2005, Jane Doe One told [petitioner] the relationship was over and asked him to move out. [Petitioner] said he would leave, but only if he could take John Doe with him. Jane Doe One refused, and told [petitioner] that she would use whatever legal means were necessary to get him out. In November 2005, [petitioner] left eggs boiling on the stove and the fire department had to come.

. . . .

Just prior to May 23, 2006, Jane Doe One found a gun in [petitioner's] things in John Doe's room. She told [petitioner] he had to remove it from the house. Thereafter, he began stealing mail and other items from Jane Doe One and Jane Doe Two. The missing items were found in his van after May 23, 2006.

<u>The Uncharged May 23, 2006, Incident</u>

On May 23, 2006, [petitioner] became upset because Jane Doe One locked her bedroom door as she went to bed. [Petitioner] told her he would "bust it open" if she did not unlock the door. She unlocked the door and [petitioner] told her he wanted to talk about their relationship. She told him there was no relationship and that she wanted him to leave so she could sleep. At that point, [petitioner], who weighed 280 pounds, lunged at Jane Doe One. She fell into the bathroom and knocked the shower door off as she fell to her knees. [Petitioner] began strangling her, saying, "I told you that it was going to come to this." He told her that if he could not have her then no one else could. When John Doe came into the bathroom crying, [petitioner] loosened his grip and sent their son back to bed.

After John Doe left, [petitioner] put Jane Doe One in a headlock and pulled her out of the bathroom into the hallway, banging her head on the doorjamb. He told her to be quiet or he would break her neck. He then began strangling her again. When John Doe came into the hallway, [petitioner] again eased up and made Jane Doe One help him put John Doe back to bed. [Petitioner] then forced Jane Doe One to sit in the living room. He apologized to her but said that she had driven him to that point. He told her not to call the police or

he would "blow his brains out" with his loaded gun. Eventually, Jane Doe One went back to bed but she could not sleep because she feared for her life and [petitioner] would not let her lock the door.

Jane Doe One contacted the police the next day, May 24. She spoke with Officer Kimberly Loughery, who observed bruising on her neck and scratches on her face. The officer photographed her injuries and helped her in obtaining a restraining order against [petitioner].

. . . .

Following the May 23, 2006, incident, [petitioner] was permitted to call John Doe twice a week and to have supervised visits with him at Terra Firma every Sunday. Pursuant to the restraining order, [petitioner] was not allowed to contact Jane Doe One or Jane Doe Two.

The Events of November 9, 2006

The events of November 9, 2006, led to the charges in this case. Fourteen-year-old Jane Doe Two lived with her mother and had known [petitioner] since she was four years old. At around 3:00 p.m., Jane Doe Two walked home from school and found [petitioner] behind the front door when she went inside. [Petitioner] had a gun in his hand and looked "crazy." He told her "today is not your lucky day." He forced her to lie on the ground, duct-taped her wrists together behind her back, and told her to be good and not yell. [Petitioner] said that everything was her mother's fault.

[Petitioner] then pulled Jane Doe Two up by her shoulders and pushed her toward the bathroom, telling her to use the bathroom because she would be waiting a long time. In the dining room, [petitioner] put duct tape over her mouth and told her a long story about how bad her mother had been to him. He then pushed her into her bedroom, cut the duct tape off her wrists, and took off all of her clothes except her underwear. He duct-taped her wrists together behind her back again, duct-taped her ankles together, made her lie on the bed, put duct tape over her eyes, covered her body with a blanket, and left the room. She heard him walk around the house, coming back from time to time and placing things on the nightstand in the bedroom.

Eventually [petitioner] returned to the bedroom, cut the duct tape off Jane Doe Two's ankles, and cut off her underwear. He told her to spread her legs. She told him "no" through the duct tape multiple times. When [petitioner] grabbed her legs, she started kicking and touched the skin of his bare chest with her feet. Earlier, he had been wearing a shirt. [Petitioner] grabbed her neck and started choking her, telling her to "shut up" or he would "make it worse." She stopped resisting because she was having trouble breathing. [Petitioner] then forced her legs open, touched her labia, and inserted his finger into her vagina. He moved his finger around inside her for "a few minutes." [Petitioner] then removed his finger and Jane Doe Two felt [petitioner] rub what felt like lotion on her "private parts." He then reinserted his finger, again moving it around inside her for "a few minutes." He removed his finger and then put something that sounded like a vibrator on her "private parts area." [Petitioner] inserted his finger a third time, and this time he bit and sucked on Jane Doe Two's right nipple as he moved his finger inside of her.

[Petitioner] was talking to Jane Doe Two while he was touching her, asking

3

her "if it felt weird" and "if people from school [had] done this to [her]." He told her that "everything he was doing was [her] mom's fault and to blame her for everything." He also said it was what she (Jane Doe Two) wanted, and kept telling her to be quiet. He kept his finger inside her for a "few minutes" each of the three times he penetrated her vagina.

. . . .

Eventually, [petitioner] cut the duct tape off her wrists and allowed Jane Doe Two put her clothes back on and go to the bathroom while she was still blindfolded. He knew that Jane Doe One had called, so he lifted the duct tape off Jane Doe Two's left eye and made her play her cell phone messages on the speaker, including her mother's message, so he could hear them. [Petitioner] put the duct tape back over both eyes and her wrists, and made her lie down on her bed again. He did not re-tape her ankles. He left, but came back into her room again after awhile and told her another story about her mother treating him badly. He told her that he was going to make her mother "tell the truth" and that she would never see her little brother, John Doe, again.

After leaving work around 5:00 p.m. and picking up John Doe from school, Jane Doe One arrived at home. John Doe liked to use his mother's keys to unlock the house, so he entered first while his mother was gathering her things from the car. John Doe was excited to see his father, and he wanted to play. When Jane Doe One entered the house, she screamed when she saw [petitioner]. She tried to get out of the house, but [petitioner] pulled her inside and covered her mouth as she struggled to get away from him. [Petitioner] punched her repeatedly, attempted to gouge her eyes, and pulled her by her hair, hitting her head twice against the wall. He repeatedly told her to "shut up," and told her it was "all her fault." When Jane Doe One told John Doe to call 911, [petitioner] told him not to and said, "Daddy is here to punish mommy. She's been bad." Jane Doe One told [petitioner] that her mother was expected to arrive. [Petitioner] responded, "Oh, well, I guess we'll just have to tie grandma up, too."

Jane Doe One calmed down when [petitioner] overpowered her. He handcuffed her wrists behind her back and duct-taped her mouth and nose. When Jane Doe One told him she could not breathe, he initially said he did not care, but then moved the tape to cover only her mouth. He then pushed her into the master bedroom and duct-taped her ankles together. Jane Doe One believed [petitioner] was going to kill her because he told her she was going to "pay" for what she had done and he was there to do what he should have done in the first place. When John Doe came into the bedroom, [petitioner] told him that his mommy had been a "very bad girl" and he was putting her in a "time-out." [Petitioner] went with John Doe to the living room and turned on the television for him.

Jane Doe One hopped to the sliding glass door and into the sunroom at the back of the house. She made her way into the backyard and through a loose board in the fence. As she went through the fence, she fell forward onto her chin, which happened to loosen the duct tape on her mouth. She got up and hopped to her neighbor's sliding glass door and screamed for help, banging on the door with her shoulder because her wrists were still bound. Jane Doe Two could hear her mother screaming outside.

4

. . . .

Jane Doe One then saw [petitioner] in [the neighbor's] yard. [Petitioner] pulled her by her hair and forced her to the ground. He began kicking and punching her in her face and chest, and told her he was going to kill her.

Gregory McClain, a home inspector, was inspecting a house after dark when he heard a woman screaming. He ran across the street, shined a light over the fence, and saw a man he would identify as [petitioner] hitting a handcuffed woman. McClain is 6'6" and had no trouble seeing over the fence. McClain opened the gate and walked through, telling [petitioner] to leave the woman alone. [Petitioner], who was continuing to hit and kick the woman, told McClain to go away, it was a domestic dispute, and "none of [his] business." McClain repeated, "leave her alone," but backed away when [petitioner] swiftly approached him. McClain dialed 911, but was put on hold. [Petitioner] followed McClain outside the gate and twice demanded McClain's cell phone. When McClain did not comply, [petitioner] pulled a gun out of his pocket, pointed it at McClain's head, and said, "Give me the fuckin' phone." McClain feared for his life, so he gave [petitioner] his phone. [Petitioner] looked at the phone for about 10 to 15 seconds, and McClain told [petitioner] there were other people calling 911. [Petitioner] looked around. At the time, there were other people standing on their doorsteps. [Petitioner] then threw McClain's phone into a bush about 30 feet away from the fence. McClain went back to the house he was inspecting, put on his boots which he had removed to do the inspection, and returned to the scene.

Jane Doe One was trying to get to her feet when she saw John Doe come into the yard. She asked him if he called 911. John Doe indicated that he had not, pushed her back down to the ground, and called to [petitioner], "Hurry, Daddy, she's getting away." [Petitioner] went back into Kaur's yard, but he walked right by Jane Doe One. He left with John Doe, telling him, "come on.... We have to get out of here."

Jane Doe Two heard [petitioner] leave with John Doe. She was able to get the duct tape off her mouth and eyes, but not her wrists. Around 6:30 p.m., she called 911. Her panicked 911 call was played for the jury. Jane Doe Two informed dispatch that [petitioner] had a gun.

. . . .

Sergeant Frederick Bobbit was dispatched to Jane Doe One's residence on reports of a woman screaming. No one was home when he arrived. After a protective sweep, he went through a fence board to the [neighbor's] residence, where he found [another officer] attending to Jane Doe One in the garage. Unable to locate John Doe, Bobbit activated an Amber Alert. Jane Doe One was taken to the hospital.

. . . .

At 11:08 p.m., Jane Doe Two arrived at the hospital. Dana Kelly, a physician's assistant and an expert in sexual assault examination, examined Jane Doe Two. Kelly documented that Jane Doe Two had bruising and swelling on her right nipple and areola, consistent with someone biting her breast. She also had injuries to the lower part of her vaginal opening and posterior fourchette, including redness, swelling, and abrasions. Jane Doe Two could not tolerate

having a speculum inserted into her vagina, so Kelly was unable to do an internal examination. Kelly noticed that Jane Doe Two had adhesive on her wrists and that her ankles were sticky. Her injuries were consistent with what she described taking place during the incident. Kelly opined that Jane Doe Two's injuries were consistent with at least an attempted digital penetration, but she could not determine whether there was complete penetration because she was unable to perform the internal examination.

Around 11:30 p.m. in Red Bluff, Highway Patrol Officer Balma spotted [petitioner] driving the gold Saturn as a result of the Amber Alert broadcast earlier that evening. Officer Balma arranged for assistance and initiated a vehicle stop. [Petitioner] did not pull over, and instead led several police vehicles on a 40-mile chase until officers were able to spike [petitioner's] tires and stop his vehicle. Inside the Saturn, officers found a six-year-old "crumpled" down in the back seat floorboard area.

A search of the Saturn revealed two pistol magazines and brass knuckles. Officer John Balma also found a .380 cartridge (which fit into the magazines) in [petitioner's] pocket. Sergeant Bobbit traveled to Red Bluff where he placed [petitioner] in custody. John Doe was reunited with his mother in San Leandro at a center for interviewing traumatized children.

The Saturn was later towed to the police station where it was processed by Officer Gaziano. He found three knives and the passports of Jane Doe One, Jane Doe Two, and John Doe. Inside a backpack in the car, Gaziano found a razor blade and a roll of duct tape. Inside a Crown Royal bag, the officer found a bottle of K-Y gel and a nose hair trimmer which vibrated when it was turned on.

*People v. Baldenegro*, 2011 WL 826179 at *1-7 (Cal. Ct. App. March 10, 2011) (footnotes omitted).

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**DISCUSSION**

As grounds for federal habeas relief, petitioner argues that:

(1) There was insufficient evidence that the sexual offenses were separate so as to support consecutive sentencing;

(2) there was insufficient evidence of specific intent to permanently deprive the owner of his property as to the robbery conviction; and

(3) an instruction on unanimity was required as to which of petitioner's acts constituted entry for purposes of the burglary charge.

**I.  Consecutive Sentences**

  **A.  Legal Standard**

"The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *accord. Souch v. Shaivo*, 289 F.3d 616, 623 (9th Cir. 2002) ("because the trial court actually had *absolute discretion* to impose either consecutive or concurrent sentences[,] ... neither an alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged failure to list reasons for imposing consecutive sentences, can form the basis for federal habeas relief." (emphasis in original)); *see also Oregon v. Ice*, 555 U.S. 160 (2009) (no *Apprendi* error if a judge determines to impose consecutive sentences in lieu of the jury).

  **B.  Analysis**

Petitioner contends that he was improperly sentenced, with respect to the sexual assault charges, to three full consecutive terms under California Penal Code § 667.6(d), which provides that "[a] full, separate, and consecutive term shall be imposed for each violation . . . if the crimes involve separate victims or involve the same victim on separate occasions." Cal. Penal Code § 667.6. The statute further provides: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions

8

and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." § 667.6, subd. (d).

Petitioner argues that the three forcible sexual penetrations of Jane Doe Two did not take place on separate occasions, and that they were part of a continuous sexual assault and thus he had no meaningful opportunity for reflection, as required by § 667.6, subd. (d).

The California Court of Appeal rejected petitioner's challenge regarding consecutive sentences:

> In sentencing [petitioner] on these offenses, the trial court stated: "The jury found, in finding the defendant guilty of those offenses, they found that he committed separate-three separate and distinct acts of digital penetration of Jane Doe Two. And it appears to me that each of those added to and exacerbated, increased the emotional trauma and impact on the young lady. For that reason, I feel that it's appropriate to order those sentences to run consecutive with one another. So counts four, five, and six will run consecutive to each other."
>
> . . . .
>
> Here, the evidence showed not only that [petitioner] had a reasonable opportunity to reflect, but also that he did in fact reflect upon what he was doing.
>
> . . . .
>
> Moreover, although he did not interrupt his sexual abuse of Jane Doe Two to change location or engage in some non-sexual activity before "resum[ing] sexually assaultive behavior" (§ 667.6, subd. (d)), the evidence is clear that there were significant intervals after the first and second digital penetrations during which [petitioner] had ample opportunity to reflect, and did expressly reflect, before penetrating her vagina the second and third times. There was no error in the imposition of consecutive sentences.

*People v. Baldenegro*, 2011 WL 826179 at *18-20 (Cal. Ct. App. March 10, 2011).

Petitioner argues that the evidence in the case did not warrant nor could be construed as supporting a finding of "separate occasions." Pet. at 10. Whether the three penetrations qualify as "separate occasions" is a question of state law. Thus, petitioner's argument that it was one continuous episode is solely based on an interpretation of California's sentencing law, and, therefore, his claim cannot be reviewed by a federal court on a petition for habeas corpus. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is

9

not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Even if this court could review this claim, there was no error by the California court as there was sufficient evidence to support the consecutive sentences based on petitioner's actions against the victim. Therefore petitioner's claim is denied.

## II.     Sufficiency of Evidence To Support Robbery Conviction

### A.     Legal Standard

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993). Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference. *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Id.* at 324. "[T]he only question under *Jackson* is whether that [jury] finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012). Further, sufficiency claims on federal habeas review are subject to a "twice-deferential standard." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 319). Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable." *Id.* (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)).

### B.     Analysis

Petitioner contends that there was insufficient evidence to support his conviction for the robbery of the cellular phone, which was based on petitioner throwing Gregory McClain's phone away while McClain was trying to make a 911 call. He states that the evidence was insufficient to establish that he had the specific intent to permanently deprive the owner of his cellular phone. Rather, he contends the malicious removal and obstruction

10

1  of McClain's use of the wireless device was a violation of Section 591.5,[1] but not a robbery.
2  Pet. at 21-22.

3  The California Court of Appeal rejected petitioner's challenge to the sufficiency of the
4  evidence for the robbery conviction:

> Contrary to [petitioner's] assertions, the evidence supports a reasonable inference that [petitioner] intended to steal McClain's cell phone. McClain testified that he called 911 and was on hold when [petitioner] pointed a gun at his head and demanded his cell phone. McClain gave him the phone but pointed out that other people were also calling 911. [Petitioner] then threw the cell phone about 30 feet away into a bush. The jury could have reasonably inferred that [petitioner] initially intended to permanently deprive McClain of his cell phone, but instead threw the phone and hastily fled with John Doe upon realizing that the arrival of the police was imminent. The fact that McClain later recovered his phone does not negate the reasonable inference that at the time [petitioner] demanded the phone at gunpoint and took it, it was [petitioner's] intention to deprive McClain of it permanently. (*See People v. Carroll* (1970) 1 Cal.3d 581, 584 [although the defendant discarded the wallet when he realized it was empty, it was reasonable to infer that when he took the wallet he intended to deprive the owner of it permanently]; *see also In re Albert A.* (1996) 47 Cal. App. 4th 1004, 1008 ["[T]he return of property previously taken does not compel the conclusion that a defendant intended only to temporarily deprive the owner of the property. [Citations.]"].) Drawing all reasonable inferences in favor of the judgment, the specific intent to deprive McClain of his cell phone permanently is supported by substantial evidence.

*People v. Baldenegro*, 2011 WL 826179 at *18 (Cal. Ct. App. March 10, 2011).

Petitioner presents the same argument before this court that he made before the California courts, and is attempting to use a petition for a writ of habeas corpus to argue his preferred interpretation of the intent element of robbery under California law. Of course, federal habeas relief is unavailable for violations of state law or for alleged error in the interpretation or application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Regardless, there was sufficient evidence for the jury to find him guilty of robbery.

Under California law, "robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211. It must be proven

---

[1] Section 591.5 provides: "A person who unlawfully and maliciously removes, injures, destroys, damages, or obstructs the use of any wireless communication device with the intent to prevent the use of the device to summon assistance or notify law enforcement or any public safety agency of a crime is guilty of a misdemeanor." Cal. Penal Code § 591.5.

beyond a reasonable doubt that the defendant took property from another "by means of force or fear with the specific intent to permanently deprive him of that property." *People v. Young*, 34 Cal. 4th 1149, 1176-77 (2005). The evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. *People v. Tafoya*, 42 Cal. 4th 147, 170 (2007). "[T]he intent required for robbery . . . is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime." *People v. Lewis*, 25 Cal. 4th 610, 643 (2001). Intent to permanently deprive can arise when a defendant asserts control over the property in a manner that creates a substantial risk of permanent loss. *People v. Davis*, 19 Cal. 4th 301, 309 (1998); *People v. Mumm*, 98 Cal. App. 4th 812, 819 (2002). Motive is not essential to establish the required intent. *People v. Ottenstror*, 127 Cal. App. 2d 104, 111 (1954).

There was sufficient evidence against petitioner to sustain the robbery conviction that also demonstrated his intent to permanently deprive McClain of the cellular phone. It is undisputed that petitioner took McClain's cellular phone by means of force or fear when he pointed a gun at his McClain's head and demanded the phone as McClain was attempting to call 911. 4 Reporter's Transcript (RT) 574-76. Petitioner took the phone, looked at the phone for about ten to fifteen seconds, looked around and then threw the phone at a distance of thirty feet, which landed in a bush, before petitioner left. *Id.*

The jury could infer that petitioner intended to steal the cellular phone which was supported by evidence that petitioner repeatedly demanded the phone while making a physical threat by pointing the gun at McClain. 4RT 575-76. A reasonable juror could also conclude that petitioner had the specific intent to permanently deprive McClain of his cellular phone based on the taking of it, the time spent looking at it and the surrounding area before throwing the phone. The California Court of Appeal's rejection of petitioner's insufficiency claim was not contrary to or an unreasonable application established supreme court authority and this claim is denied.

///

**III. Failure to Give Unanimity Instruction**

12

### A.  Legal Standard

Criminal defendants in state court have no federal constitutional right to a unanimous jury verdict. *See Schad v. Arizona*, 501 U.S. 624, 631–32 (1991) (rule that jurors not required to agree upon single means of commission of crime applies equally to contention they must agree on one of alternative means of satisfying mental state element of crime); *Apodaca v. Oregon*, 406 U.S. 404, 410–12 (1972) (rejecting 6th Amendment right to jury trial challenge to 10–2 state jury verdict); *Johnson v. Louisiana*, 406 U.S. 356, 359–63 (1972) (rejecting due process challenge to 9–3 state jury verdict).

Federal habeas relief is available for the omission of a jury instruction only if the error "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.

### B.  Analysis

Petitioner contends that the trial court erred by not giving the jury a unanimity instruction, thus violating his rights to due process and fair jury trial under the Fourteenth and Sixth Amendments. Pet. at 23. Specifically he argues that the burglary verdict could have been based on three different entries: the entry into the house; the entry into Jane Doe One's bedroom; or the entry into Jane Doe Two's bedroom. Petitioner contends the verdict was therefore not unanimous as jurors differed in that some could have found that petitioner intended to commit a sex crime when he entered Jane Doe Two's bedroom while others could have found that petitioner intended to inflict corporal injury on Jane Doe One when he entered her bedroom.

The trial court instructed the jury on the elements of burglary, stating:

> In order to prove [petitioner] is guilty of [first-degree burglary], the People must prove the following two elements: [¶] One, that [petitioner] entered an inhabited house-and remember you're going to get these in writing. [¶] Two, when he entered the inhabited house, he intended to commit one or more of the following felonies, and there are four: [¶] One is murder; [¶] Two, infliction

13

of corporal injury on his child's mother; [¶] Three, forcible sexual penetration; or [¶] Four, kidnapping. [¶] So when he entered an inhabited house, he intended to commit one or more of those crimes. [¶] A house is inhabited if somebody uses it as a dwelling, whether or not somebody was actually inside at the time of the entry. [¶] To decide whether [petitioner] intended to commit one of those listed felonies, please refer to the separate instructions that I'm going to give you on those crimes. [¶] A burglary was committed if [petitioner] entered with the intent to commit one of those listed felonies. [Petitioner] does not need to have actually committed one of those felonies, as long as he entered with the intent to do so.

5RT 786-87

As set forth below the only act alleged by the prosecution as the basis of the burglary was petitioner's entry into the house and at trial petitioner testified that he had entered Jane Doe One's residence (4RT 655), but claimed that his only intent was to take his son from the house because he believed that John Doe was in imminent danger and needed protection (4RT 653-54).

The California Court of Appeal rejected petitioner's claim that the trial court had committed an instructional error:

> [T]he only act alleged by the prosecution as the basis of the burglary charge was [petitioner's] entry into the house. There is no support for [petitioner's] contention that "[t]he four various intents charged in the information allowed the jury to consider several entries shown by the evidence at trial." Our review of the jury instructions, closing arguments by the prosecution and defense counsel, and the verdict forms themselves indicates that the court and counsel below consistently referred to the house as the relevant entry point for the burglary charge and the enhancements based on first-degree burglary.
>
> [A]lthough it is a correct statement of the law that the specific intent for burglary may be harbored during the entry of a residence or during a subsequent entry into a room within the residence (see, e.g., *People v. Sparks* (2002) 28 Cal. 4th 71, 73 [entry into a bedroom with intent to commit rape can support a burglary conviction even if the intent was not formed until after defendant entered the home]), there was no evidence at trial that [petitioner's] intent to commit a felony within Jane Doe One's house did not arise until after he had entered the home.
>
> . . . .
>
> [Petitioner] cites no evidence in the record that the jury was even aware of the charging language of the information, much less that they construed it to mean that there were several possible entries to consider.

*People v. Baldenegro*, 2011 WL 826179 at *12-13 (Cal. Ct. App. March 10, 2011) (footnote omitted).

14

Since a criminal defendant in a state prosecution is not entitled to juror unanimity under the constitution or federal law, the state court's determination that an instruction on jury unanimity was unnecessary under state law cannot be considered contrary to, or an unreasonable application of clearly established federal law. Moreover, petitioner has failed to show that the lack of a unanimity instruction in this case so infected the entire trial that the resulting conviction was a violation of due process.

Here, the prosecutor only argued that petitioner's liability could be predicated on his entry into Jane Doe One's house. 2 Clerk's Transcript (CT) 244. The evidence does not show that the jury misinterpreted the information to mean that there were several possible entries. The jury instructions, both counsels' closing arguments, and the verdict forms all consistently referred to the house as the entry point for the burglary charge and the enhancements. 3CT 416; 5RT 806-07, 829-30, 857-58, 865, 874, 915.

Petitioner's claim only presents the possibility the jury may have been uncertain as to the exact manner that petitioner was guilty of burglary. He has failed to show that the jury actually disagreed about whether he was guilty of burglary or even the exact facts behind the guilty verdict. Moreover, even if there was an instructional error, it did not so infect the entire trial that the resulting conviction violated due process. Petitioner's claim of instructional error does not merit habeas relief.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**Certificate of Appealability**

To obtain a certificate of appealability, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a COA

15

to indicate which issues satisfy the COA standard. Here, the court finds that one issue presented by petitioner in his petition meets the above standard and accordingly GRANTS the COA as to that issue. *See generally Miller–El v. Cockrell*, 537 U.S. at 322. That issue is:

(1) whether there was insufficient evidence that the sexual offenses were separate so as to support consecutive sentencing.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated: April 8, 2013.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.12\Baldenegro3072.rul.wpd